UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| KAREN STAGE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) 1:10-CV-5 |
| v. | ) |
| | ) Chief Judge Curtis L. Collier |
| PPG INDUSTRIES, INC., and | ) |
| PPG ARCHITECTURAL FINISHES, INC., | ) |
| | ) |
| Defendants. | ) |

## **M E M O R A N D U M**

This case involves two distinct issues: (1) whether Defendants PPG Industries, Inc. and PPG Architectural Finishes, Inc. (collectively "PPG") unlawfully retaliated against Plaintiff Karen Stage ("Stage"); and (2) whether PPG misclassified Stage as "exempt" from overtime provisions of federal labor law. Before the Court are cross-motions for partial summary judgment. PPG moves for full summary judgment on the retaliation claims and partial summary judgment on several elements of the overtime claim (Court File No. 54). Stage has responded (Court File No. 63), and PPG has replied (Court File No. 66). Stage, for her part, moves for summary judgment only with respect to the overtime claim (Court File No. 56). PPG has responded (Court File No. 62), and Stage has replied (Court File No. 65). For the reasons stated herein, the Court will **GRANT IN PART** and **DENY IN PART** PPG's motion for summary judgment (Court File No. 54): the Court will **GRANT** summary judgment for PPG on Stage's retaliation claims, but will **DENY** summary judgment on the several elements of the overtime claim identified by PPG. Additionally, the Court will **DENY** Stage's motion for partial summary judgment (Court File No. 56). These dispositions will leave one claim standing for trial: Stage's claim she was misclassified as "exempt" from applicable overtime provisions.

## I. RELEVANT FACTS[1]

Stage was employed by PPG as a "Territory Manager" from April 2007 until February 2010. PPG manufactures paint and stain products, and markets them under a number of brands, including the "Olympic" brand. PPG sells Olympic products to Lowe's home improvement stores, which in turn sell the products to consumers. PPG employs Territory Managers to help promote its Olympic products in Lowe's stores. Put simply, Territory Managers "circuit ride" the Lowe's stores in their assigned region, building fruitful relationships with Lowe's managers, training Lowe's employees regarding the attributes and advantages of Olympic products, setting up product displays in Lowe's stores, educating Lowe's customers, and so forth (Court File No. 55-2, ¶¶ 5-7). As a Territory Manager, Stage's territory included 10 or 11 Lowe's stores in and around Chattanooga. In a typical day, Stage would transport promotional materials from her home to her assigned Lowe's stores, organize the inventory, tend the color sample display, and assist Lowe's customers and workers with information about paint.

In March 2009 Stage was diagnosed with a mucoepidermal carcinoma, which is a type of mouth cancer occurring in the salivary glands. She immediately took FMLA leave to receive treatment for the cancer. For six to eight weeks, Stage received daily radiation therapy (Court File No. 63-6, p. 2). Stage considered coming back to work in May 2009, and was cleared by her doctor to return, but PPG required her to take more medical leave after she informed them on May 27,

---

[1]This exposition of the facts centers on facts which are relevant to the retaliation issue. This is because the facts relating to the substance of the overtime issue have little to do with the substance of the retaliation issue, and the facts relating to the retaliation issue are clear and uncontested, while the facts relating to the overtime issue are less clear and very contested. The overtime issue will be addressed at the end of this memorandum.

2

Case 1:10-cv-00005-CLC-SKL   Document 91   Filed 06/24/11   Page 2 of 19   PageID #: 1750

2009, that "I am currently still on pain pills and that prevents me from traveling more than 30 minutes from home since I fall asleep without warning. It's freaky! And scary as h---l." (Court File No. 55-3, pp. 40-41). Stage was not pleased about this forced medical leave, and in a worried e-mail to her supervisor Denny Smith on June 14, 2009, she asked, "Am I being phased out due to my illness?" (Court File No. 63-7, p. 2). Stage was not phased out, however. On June 22, 2009, Stage returned to work on half-time status, and on June 30, 2009, she began working full time again (Court File No. 55-3, pp. 16-18). Stage was paid for the entire time she was off, and the parties do not dispute she was compensated appropriately during her medical absences (*see id*. at p. 16).

Around July 2009, Stage's remaining vacation days were beginning to run low.[2] On July 26, 2009, Stage e-mailed Denny Smith to request vacation time so she could go to Pensacola, Florida (Court File No. 63-8, pp. 2-3). Smith approved the vacation time, but cautioned Stage that after the Pensacola trip she would only have half a vacation day remaining (*id*. at p. 2).[3] Stage wrote back a frantic e-mail, expressing her belief that she had more vacation time left: "I have only used 3 days of vacation previous to this one on the 28th. Dave and I confirmed that!!!! Help????? [W]hat has happened?? I should still have 6 days vacation and one floating holiday left. SCREECH!!!!!!

---

[2]Some vacation days had been used during her course of treatment, and her half-time week in June 2009 had been "topped off" with vacation hours so she was paid for the full week.

[3]Plaintiff makes much out of Smith referring to Stage as "Ms. Negativity" in this e-mail, framing it as evidence of PPG's callousness towards Stage's medical condition. This characterization is misleading. Stage ended her July 26, 2009 vacation-request e-mail to Smith by saying, "Keep in touch!! Hope you had somewhat of a decent vacation and the wedding went well. I don't look forward to the conference call since I am guessing the content and don't like what I think." Smith opened his response e-mail by addressing the conference call, saying, "Well Ms. Negativity, the conference call today is not a bad one, but rather a good one. So there!!! On a more serious note, I don't have a problem with the 28th [i.e. the date Stage wanted to take vacation] . . . ." From the context it is clear that Smith's use of the phrase "Ms. Negativity" was jocular in nature, and wholly unindicative of any callousness towards Stage's condition.

3

Please let me be right!" (*id*.). Smith wrote back explaining his calculation of Stage's vacation time. Smith told Stage to let him know if the calculation was incorrect, so they could have a conference call "to straighten it out" (*id*.). Internal e-mails from PPG show PPG looked into the matter, and determined Stage was due at least one more vacation day than Smith had originally told her (Court File No. 63-9, p. 2).

In July or August 2009, Shane Calkin became a regional manager, and Stage began reporting directly to Calkin. Also around this time, PPG Team Managers, including Stage, apparently were being required to work longer hours without additional compensation.[4] In September 2009, Stage wrote an e-mail to Calkin wherein she complained that he had called her after 4:30 p.m.[5] Emphasizing her need for personal time, Stage wrote, "I don't have enough personal time as it is and we keep getting more and more tasks and reports added to our personal time with no more compensation, as you and I spoke of when you shadowed me week before last." (Court File No. 63-14, p. 18). On October 19, 2009, Stage again wrote Calkin, complaining that he was adding extra work requirements without raising compensation: "I don't get overtime for this extra office time that you are creating and we all wish you would find a form and stick to it. We have all had a great deal of computer time added to our 60 hr week and not [sic] compensation of income, so please try to limit what you are adding to our responsibilities. I had ONE day this weekend to enjoy my time off . . . . Please try to decrease our reporting time instead of increasing it. In my 3 years, I have never had this much reporting time! Thanks for your consideration. Karen. PS. Enjoy your

---

[4]In 2009, at least three lawsuits were filed against PPG by Team Managers, alleging overtime violations similar to the ones Stage alleges in this lawsuit.

[5]Apparently Stage started her work day earlier than Calkin realized, so she was on "personal time" when Calkin called her after 4:30 p.m..

vacation......." (*id*. at p. 20). Also, in a December 2009 conference call with Calkin and his boss Kyle Grube, Stage challenged the legality of PPG's practice of not compensating Team Managers for their travel times between work sites and home (Court File No. 63-15).

In October 2009, Calkin decided to place Stage on a Performance Improvement Plan ("PIP"). Calkin began drafting the PIP with input from Grube and Emily Kovatch from human resources. He also spoke with Stage about the PIP as it was being developed, and made some changes to the PIP based on her input (Court File No. 55-5, p. 27). After numerous revisions and updates, the final PIP was issued on December 22, 2009 (*id*. at pp. 37-42). At the top of the PIP form, three of the four preprinted "reasons" for the issuance of the PIP had check marks by them: Policy/Procedure Violation; Inappropriate Behavior/Conduct; and Work Performance.[6]

The PIP went on to address four areas of concern. First, it expressed concern that Stage was not spending enough time in Lowe's stores (Court File No. 55-5, p. 38). The PIP advised Stage that the "goal is to service each of our stores for a minimum of 3 times a month, where 8 hours of store time is logged in each day." (*Id*.). It noted Stage appeared confused on whether driving time counted towards this goal, and instructed her that, "[g]oing forward, time can only be reduced in store coverage when combined drive time exceeds [2.5] hours." (*Id*.).

Second, the PIP expressed concern that Stage "continue[d] to miss deadlines for [filing] multiple reports and [was] not submitting them in the requested format." (*Id*.).

Third, the PIP expressed concern about the tone of Stage's communications with supervisors,

---

[6]The fourth preprinted reason – Absenteeism and Tardiness – was not checked. One earlier revision only checked the "Policy/Procedure Violation" and "Work Performance" reasons (Court File No. 63-14, p. 7), and another earlier version apparently checked the "Absenteeism and Tardiness" reason (Court File No. 63-13, p. 2). Kovatch recommended Calkin uncheck the Absenteeism reason, "because this isn't really what it is about." (*Id*.).

5

both verbally and in e-mail. The PIP described this tone as "negative and at times disrespectful." (*Id.*; *see also id.* at 17 (Calkin describing the way Stage's tone and grammar in e-mails came across as very aggressive)).

Finally, the PIP expressed concern about Stage's taking an unscheduled day off on November 30, 2009, without prior notice. (*Id*. at p. 38). On that date, Stage e-mailed Calkin in the morning and told him she was "still on vacation," and asked him to just make it a day without pay (*id*. at p. 35).

For the next month, Stage apparently operated under the PIP without incident, though on January 8, 2010, she commenced the "overtime" portion of the present lawsuit. On January 26, 2010, however, events transpired which precipitated her termination. On that date, Lowe's store #425 received report of a formal complaint made by a customer's husband. The report stated, in pertinent part:

> Customer stated that his wife was in the store for over 30 min. and wasted her entire lunch break trying to get someone to help match some paint. Stated that a Vendor was the one behind the counter turning away customers stating that she was unable to assist them and then calling for the next customer to state the same sentence. Stated that she then went and found another associate to request to speak to a manager and was told to look for someone wearing a blue vest. Stated that this is very poor customer service and something needs to be done. Stated that Lowe's is losing business because of this vendor.

(Court File No. 55-7, p. 32). Stage was that vendor. After being turned away by Stage, the disgruntled customer left and went to Home Depot.[7]

---

[7] Stage's characterization of the incident is quite different from the complainant's. According to Stage, she offered to cover the paint desk for a Lowe's employee who wanted to go to lunch (Court File No. 63-1, p. 8). Shortly thereafter, the paint department became very busy and Stage could not manage all of the customers. She called for help over the Lowe's intercom, to no avail. At some point, the complaining customer approached Stage and asked Stage to match a paint chip. Stage told the customer the chip was too small to match, but Stage could help her if she brought in

6

David Buckner was the Lowe's manager on duty when the customer called to complain via telephone (Court File No. 55-9, p. 6). Buckner apologized and asked if there was anything he could do to solve the problem, but the customer said she had already filled her order at Home Depot (*id*. at p. 7). The disgruntled customer also called Lowe's corporate to lodge the same complaint (*id*. at p. 6). Corporate relayed this complaint back to Lowe's store #425, and Buckner called the customer back to apologize again. After receiving the complaint, Buckner discussed it with Michael Smith, the manager of Lowe's store #425 (*id*. at p. 7). Prompted by the complaint, Smith asked Lowe's paint department employees about Stage's general performance and attitude (Court File No. 55-7, p. 12). Lowe's employee Bobby Travis told Smith that he had witnessed Stage being rude and short with customers before (*id*. at p. 19). Lowe's employee Brent Sherrell told Smith that he generally "tried to avoid" Stage "because of her attitude." (*id*. at pp. 19-20). Smith himself had experienced one negative encounter with Stage. On that occasion, Smith approached Stage, who was standing behind the paint counter, with a customer's question about Olympic paint. Stage brushed Smith off, telling Smith she was "off the clock," and advising him to call a 1-800 number (*id*. at p. 13). Smith told Stage that if she was "off the clock," she should not be standing behind the counter. At that point, Stage left. (*Id*.). Stage had also previously told Smith that she "didn't like her job" with PPG, and "she always was saying that she hated working for them" (*id*. at pp. 17-18).

Based on the customer complaint about Stage, as well as the input he received from other Lowe's employees regarding Stage's attitude and rudeness towards customers, Smith decided he did not want Stage to return to Lowe's store #425. The next time Stage came to Lowe's store #425, the paint department manager told her she was no longer allowed in the store, per Smith's instruction.

---

a larger chip. The customer left. According to Stage, the customer did not seem angry (*id*. at p. 9).

7

Stage continued working in the store, however, as she felt she needed to hear this directly from Smith, and Smith was off that day (Court File No. 63-1, p. 9). The next morning, Stage returned to the store to meet with Smith. During the meeting Smith "started [to] tell her about this is the complaint we had." (Court File No. 55-7, p. 22). According to Smith, Stage "said she was being set up" and "kind of got loud and kind of got rude." (*Id.*). At that point, Smith told Stage he was permanently banning her from the store. According to Stage, Smith said her attitude was bad, and he knew she "was not happy with PPG,"[8] and "he was just sick and tired of me and he wanted me out of his store." (Court File No. 63-1, p. 10).

On February 1, 2010, Michael Spradlin became Stage's new regional manager. On February 5, 2010, Stage called Spradlin to tell him she had been permanently banned from Lowe's store #425. Spradlin asked what happened, and Stage told him she "had a problem with a customer, a Lowe's customer in the store, and the customer had wrote a complaint letter to the Lowe's corporate office that had gotten back to the store manager." (Court File No. 55-8, pp. 6-7). Spradlin immediately notified his boss, Kyle Grube, about this situation. Grube instructed Spradlin to speak with the Lowe's store manager to get "his side of the story." (*Id.* at pp. 10-11). Spradlin spoke with Smith, and Smith told him Stage was "rude to the customer" and the customer "got upset and actually went down the street to Home Depot and got the paint that she needed." (*Id.* at pp. 12-13). Smith further told Spradlin "he just can't have the vendors in his store treating his customers rudely," and he "did not want [Stage] back inside the store servicing the store anymore." (*Id.* at p. 13).

Spradlin then spoke with Brian Catarat, the paint department manager at Lowe's store #425,

---

[8]Smith was not aware, however, that Stage had filed suit against PPG on the overtime dispute several weeks earlier (Court File No. 55-7, p. 18).

8

and asked him generally about Stage. Catarat told Spradlin that "when [Stage] comes in to the store she wants to complain about the problems that she is having with PPG and her job," but Catarat "needed her to come in and do the work she was supposed to do for him taking care of servicing the store." (*Id*. at p. 16).

Spradlin told Grube what he had learned through his conversations with Stage, Smith, and Catarat. Emily Kovatch from PPG human resources also investigated the circumstances surrounding Stage's expulsion from the store. Kovatch spoke with Stage, Smith, Lowe's zone manager Jon Lanham, and Spradlin (Court File No. 55-4, pp. 13-22). Ultimately, members of PPG's management including Grube, Kovatch, and Grube's supervisor, Sherry Calhoun, reached a "team" decision that Stage should be terminated due to her permanent expulsion from Lowe's store #425 (*id*. at p. 6).[9] PPG terminated Stage on February 15, 2010. Shortly thereafter Stage amended her complaint to allege retaliatory discharge (Court File No. 29).

## II. **STANDARD OF REVIEW**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574

---

[9]This was not the first time PPG had terminated a Territory Manager for being banned from a Lowe's store. PPG had terminated a Territory Manager who was banned from a Lowe's store after refusing to wear a Lowe's vest (Court File No. 55-4, pp. 9-10).

9

(1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based merely on its allegations; it must submit significant probative evidence to support its claims. *See Celotex*, 477 U.S. at 324; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Should the non-movant fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should enter summary judgment. *Id.* at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

**III.   ANALYSIS**

    **A. Retaliation**

Stage alleges she was unlawfully given a PIP and terminated in retaliation for engaging in conduct protected by the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA") and the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"). Specifically, Stage asserts the retaliation was due to her taking FMLA-protected leave for her cancer treatments, and for complaining that she was misclassified as exempt from the overtime provisions of the FLSA.

FMLA and FLSA retaliation claims are both analyzed under the same burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Edgar v. JAC Prods.*,

10

443 F.3d 501, 508 (6th Cir. 2006) (FMLA retaliation); *Adair v. Charter Cnty. of Wayne*, 452 F.3d 482, 489-91 (6th Cir. 2006) (FLSA retaliation). Under this framework, a plaintiff must first establish a *prima facie* case of retaliation by proving (1) she engaged in a protected activity; (2) her exercise of this right was known to the employer; (3) she suffered an adverse employment action; and (4) there was a causal connection between the exercise of her rights and the adverse employment action.[10] *See Adair*, 452 F.3d at 489. If the plaintiff makes this showing, "the burden then shifts to the defendant to set forth a legitimate, non-[retaliatory] reason for the adverse employment action. If the defendant carries this burden, the plaintiff must then prove by a preponderance of the evidence that the defendant's proffered reasons were not its true reasons, but merely a pretext for illegal discrimination." *Id.* (citations omitted).

In its summary judgment memorandum, PPG does not contest the first three elements of Stage's *prima facie* retaliation claims,[11] but argues only the fourth element: that Stage has not proffered sufficient proof suggesting a causal connection between her protected activity and the adverse employment actions.[12] The only issue in dispute, then, is whether Stage has proffered sufficient proof suggesting a causal connection between her protected activity and the adverse

---

[10]The formulation of the plaintiff's *prima facie* case in FMLA cases typically omits the second element. *See, e.g.*, *Edgar*, 443 F.3d at 508. This is because the second element is satisfied as a matter of course in FMLA cases, since it is unlikely an employee could exercise his FMLA rights without his employer's knowledge. For purposes of the present case, any differences in what is required to establish a *prima facie* case of retaliation under the FMLA and FLSA are immaterial.

[11]The taking of FMLA leave is the "protected activity" with respect to the FMLA claim, *see* 29 C.F.R. § 825.220(c), and oral complaints about improper overtime payments are the "protected activities" with respect to the FLSA claim, *see Kasten v. Saint-Gobain Perf. Plastics Corp.*, 2011 WL 977061, *4 (March 22, 2011). Stage's PIP and her termination are the "adverse actions."

[12]In its reply brief, PPG argues for the first time that Stage's complaints regarding compensation were not FLSA protected activities. The Court will not address this argument.

11

employment actions. "Although no one factor is dispositive in establishing a causal connection, evidence that the defendant treated the plaintiff differently from identically situated employees or that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Allen v. Michigan Dep't of Correction*, 165 F.3d 405, 413 (6th Cir. 1999). While Sixth Circuit cases are divided on whether causation can ever be shown *solely* by proximity, *see Hamilton v. Starcom Mediavest Grp.*, 522 F.3d 623, 629 & nn.1–3 (6th Cir. 2008), the cases do indicate that "proximity alone generally will not suffice where the adverse action occurs more than a few months" after the protected activity, *id.* at 629.

Here, the Court determines Stage cannot show any causal connection between her FMLA protected activity and the adverse employment actions, though she can with respect to the FLSA protected activity. With respect to FMLA retaliation, Stage's protected activity – her FMLA leave – ceased approximately six months before she received the PIP. Viewing the facts most favorably to Stage, she can point to nothing in the intervening period that reasonably supports the inference PPG's disciplinary actions were in any way connected to her medical leave. While she experienced some conflicts with management regarding the number of vacation days she had left, nothing in the e-mails regarding these conflicts shows resentment or exasperation with the amount of FMLA leave Stage had taken.[13] Furthermore, the only reference the PIP makes to Stage's work attendance is an unapproved vacation day she took in November 2009. However, this absence was unrelated to any medical problems. Quite simply, there is not a scintilla of proof connecting Stage's FMLA leave

---

[13]Stage cites as evidence of a causal connection a September 22, 2009 e-mail in which Calkin asked Grube what to do since Stage had called in sick but was out of sick days and vacation days, and Grube responded "celebrate she called you." However, the sarcasm in Grube's response relates only to Stage's reliability in communicating with management, not her health or frequency of absences. Furthermore, the record does not indicate this sick day was related to Stage's cancer.

12

with her PIP or termination, thus summary judgment for PPG on Stage's FMLA retaliation claim is appropriate.

With respect to FLSA retaliation, Stage can show a causal connection between her complaints regarding overtime and her termination sufficient to support a *prima facie* case of retaliation. In contrast to the FMLA claim, where the protected activity preceded the adverse action by about six months, Stage's complaints regarding overtime were ongoing in the weeks and months before her PIP and termination, and she filed the present lawsuit just one month before she was terminated. Accordingly, considering the extremely close temporal proximity between Stage's protected activity and the adverse employment action, the Court determines Stage has presented sufficient evidence to show a causal connection between her FLSA protected activity and the adverse employment actions. Thus, Stage adequately establishes a *prima facie* case of FLSA retaliation.

However, despite this evidence of causal connection, PPG easily carries its burden of articulating legitimate, non-retaliatory reasons for its decision to place Stage on a PIP and to terminate her. PPG articulated four reasons for putting Stage on the PIP: Stage was not spending as much time in Lowe's stores as PPG wanted; Stage was missing deadlines for submitting reports; Stage's tone and attitude in her communications with management left much to be desired; and Stage took an unscheduled day off. These reasons are facially legitimate, and nothing in the record indicates otherwise or bespeaks a retaliatory motive. Indeed, Stage was not the only Territory Manager complaining about PPG's nonpayment of overtime,[14] and nothing in the record indicates

---

[14]During the time of Stage's complaints, three other lawsuits were filed by Territory Managers, and an anonymous Team Manager circulated a letter to PPG management and other Territory Managers complaining about the overtime issue.

13

it was PPG's practice to put complaining Territory Managers on PIPs or terminate them.

As for Stage's termination, PPG has articulated what is unquestionably a legitimate, non-retaliatory reason: Stage was barred from a store whose goodwill it was her job to curry and whose customers it was her job to service. Not only was she barred, but PPG received information from several Lowe's employees that indicated Stage's attitude and performance as a public face and representative of PPG was, to put it mildly, disappointing. An employee's inability to perform her job, because she has been banned from entering a third party's venue in which she was to perform her job, is a legitimate, non-retaliatory reason for termination.

Viewing the evidence most favorably to Stage, she has failed to prove by a preponderance of the evidence that PPG's proffered reasons for the PIP and the termination decision are pretextual. In order to show pretext, Stage must show that (1) PPG's proffered reasons for adverse actions had no factual basis; (2) PPG's proffered reasons did not actually motivate PPG's actions; or (3) PPG's proffered reasons were insufficient to motivate the actions. *See Adair*, 452 F.3d at 489. With respect to the PIP, Stage has not meaningfully disputed the factual legitimacy of the areas of concern listed on the PIP, or that the proffered reasons, if true, would be sufficient to motivate the PIP. The evidence reveals the PIP was produced through a months-long deliberative process that involved multiple people's input, including Stage's. No evidence before the Court indicates this process was a sham and that PPG was not actually motivated by its stated reasons. There are no "smoking guns" suggesting the PIP was really issued because Stage had complained about not receiving overtime compensation. Stage's contention otherwise appears purely speculative.

Similarly, Stage cannot show her termination for being blacklisted from Lowe's store #425 was really a pretext for FLSA retaliation. Stage's brief argues at length that she was not rude to the

14

Lowe's customer, and should not have been banned from the store. However, this is not the true issue. It is immaterial whether Stage was actually rude to the customer; what matters is whether Stage's banishment from Lowe's store #425 was truly PPG's reason for terminating her, or whether it was merely pretext for illegal retaliation.

Clearly, PPG's proffered reason for terminating Stage – her banishment from the Lowe's store – does not lack factual basis. Stage does not argue Lowe's did not receive a customer complaint about her, or that she was not actually barred from the store. As for whether PPG's proffered reasons actually motivated PPG's actions, nothing in the record suggests they did not. Stage had been complaining about her compensation for at least several months before the Lowe's incident. However, there is no evidence PPG contemplated terminating Stage until the Lowe's incident occurred. Following the incident, however, PPG promptly investigated: Spradlin got Stage's side of the story, and also spoke with Lowe's manager Michael Smith; Smith, who had spoken to several Lowe's employees about Stage, told Spradlin that he could not handle Stage's rudeness anymore and would not let her back in the store; Spradlin spoke with Lowe's paint department manager Brian Catarat, who told him that Stage frequently complained about PPG; Emily Kovatch also investigated, speaking with Stage, Smith, Spradlin, and Lowe's zone manager Jon Lanham.

These investigatory efforts appear fully legitimate, and nothing in the record suggests they were a sham, designed to give the appearance of taking the Lowe's expulsion seriously while in reality being motivated by illegitimate purposes. Stage argues PPG should have done further investigation and interviewed more people, and that the fact PPG did not do so shows the pretextual nature of its position. However, as PPG correctly points out, Stage is not entitled to the investigation

of her choice. "We do not require that the decisional process used by the employer be optimal or that it left no stone unturned. Rather, the key inquiry is whether the employer made a reasonably informed and considered decision before taking an adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 494 (6th Cir. 2001) (quotation omitted). Here, PPG's investigation, even if not "optimal," was certainly sufficient to establish PPG's honest belief that Stage had been expelled from Lowe's store #425 for being rude to a customer.[15] Nothing, other than speculation, suggests that PPG's decision to terminate Stage was not a "reasonably informed and considered decision" based on this honest belief. In other words, Stage cannot show PPG's proffered reasons did not actually motivate PPG's actions.

Finally, Stage cannot show PPG's proffered reasons, if true, were insufficient to justify her termination. An employee's expulsion for rudeness from one of ten or eleven stores in which it is her job to market her employer's product is a sufficient grounds for termination. Stage argues it was within PPG's ability to assign Lowe's store #425 to another Territory Manager, but in fact PPG had no legal duty to be so accommodating. Accordingly, Stage cannot show PPG's proffered reasons were insufficient to motivate its actions.

Viewing the evidence in the light most favorable to Stage, the Court finds Stage has stated a *prima facie* case of FLSA retaliation, but she has not carried her burden of showing PPG's legitimate, non-retaliatory reasons are pretextual. Accordingly, summary judgment is appropriate for PPG on the FLSA retaliation claim.

**B. Overtime**

---

[15]And that Lowe's employees perceived Stage to have a generally bad attitude and to complain about her job.

In addition to her retaliation claims, Stage alleges she was wrongfully misclassified as exempt from FLSA overtime requirements. The FLSA requires an employer to pay its employees for all hours worked, with pay at the rate of time-and-a-half for all hours over 40 in a work week, unless the employee is exempt from these requirements. An employer bears the burden of demonstrating that an employee is "plainly and unmistakably" covered by a statutory exemption. *See A. H. Phillips, Inc. v. Walling*, 324 U.S. 490, 493 (1945).

Stage has moved for summary judgment on the overtime claim, arguing undisputed facts show she did not satisfy the "administrative exemption" relied upon by PPG to deny her overtime compensation.[16] PPG, for its part, has moved for partial summary judgment on certain elements of the overtime claim, urging the Court to hold: (1) the first element of the administrative exception, that is, the "salary basis" element, is established; (2) Stage may not recover for time spent commuting; (3) the measure of Stage's damages is limited to the "half-time" premium; and (4) Stage cannot meet her burden of proving a "willful" violation of the FLSA, so Stage's claim is subject to a two-year statute of limitations.

The Court finds genuine issues of material fact prevent the overtime issue from being wholly decided at summary judgment in either party's favor. To read the sections of the parties' briefs describing the single job of Territory Manager is to read a tale of two positions. According to Stage,

---

[16]In a supplemental brief (Court File No. 72), Stage also urges the Court to apply issue preclusion against PPG on the overtime claim. Plaintiff relies upon a recent judgment by a Washington stage Superior Court, *Andrew Fiore v. PPG Industries, Inc.*, No. 09-2-46813-3 SEA, which held PPG could not sustain its burden that a plaintiff Territory Manager was exempt under the administrative exception from Washington's labor laws (which largely track the FLSA). The Court declines apply issue preclusion here for a number of reasons, including the fact that the Washington judgment sets forth no reasoning which enables this Court to assess the identity of facts and issues between that case and this, as well as the fact that an appeal of the Washington case is currently pending.

17

the job of Territory Manager, despite the "somewhat exalted" title, is really nothing more than a grunt position with a primary duty of manual labor and retail sales. According to PPG, although some manual labor is required of Territory Managers, their primary duty is to promote the sale of Olympic products in Lowe's by utilizing non-manual strategies such as training, securing promotional placement, partnering with Lowe's employees, and building relationships. Both parties marshal myriad facts supporting their views on whether Territory Manager's primary duties are manual or not, whether Territory Managers aim at particularized sales transactions or promotion of general sales, and whether Territory Managers exercise significant discretion or not. Furthermore, factual disputes exist regarding the *actual* content of Stage's work time versus PPG's written descriptions of the Territory Manager position. In short, adjudication of the ultimate issue of Stage's exempt classification under the administrative exception will entail resolving significant and numerous factual issues, and is inappropriate for the summary judgment stage.

Stage's amended complaint does not demand a jury for her overtime claim. Hence, given the Court's resolution of the retaliation claims in PPG's favor, this case is proceeding solely towards a bench trial. It is the Court's view that the unresolveability of the ultimate issue of Stage's exempt (mis)classification at summary judgment counsels leaving all issues, including the ancillary issues raised in PPG's motion for partial summary judgment, for the bench trial. Declining to decide piecemeal, non-dispositive elements of the overtime claim before trial promotes judicial economy, and also allows the Court to resolve the entire overtime issue while apprised of all facts and with the benefit of having heard all arguments by counsel.

IV. **CONCLUSION**

18

For the above reasons, the Court will **GRANT IN PART** and **DENY IN PART** PPG's motion for summary judgment (Court File No. 54): the Court will **GRANT** summary judgment in PPG's favor on Stage's retaliation claims, but will **DENY** summary judgment on the several elements of the overtime claim identified by PPG. Additionally, the Court will **DENY** Stage's motion for partial summary judgment (Court File No. 56). The overtime issue will proceed to trial without a jury.

An Order shall enter.

/s/
**CURTIS L. COLLIER**
**CHIEF UNITED STATES DISTRICT JUDGE**